FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**  99 JUL -9 AM 9: 59
**SOUTHERN DIVISION**

U.S. DISTRICT COURT
N.D. OF ALABAMA

LANNY J. McCALEB, et al.,

    Plaintiffs,

vs.                                                                CASE NO. CV-98-J-1431-$\cancel{S}$ J

A.O. SMITH CORPORATION, et al.,

    Defendants.

**ENTERED**

**JUL 0 9 1999**

<u>**MEMORANDUM OPINION**</u>

    Pending before the court is the defendants' motion for summary judgment (doc. 40), to which the parties have filed briefs in support of and response to as well as evidentiary submissions. The court heard oral argument on this motion on June 17, 1999 at which time all parties were present by and through their counsel of record.[1] In consideration of the motion, briefs, exhibits, evidence and oral argument, the court hereby finds as follows:

    The plaintiffs are four individuals and two married couples who each purchased at least one Harvestore silo. The years of purchase for each of the silos differ, as does the year each plaintiff ceased his/their usage of the silos. Plaintiffs Malcolm I. Henry, Sr., Lanny J. McCaleb, Alta S. and Robert Vernon Barnett ("the Barnetts"), and Tom Cornelius are all residents of the state of Alabama. (Complaint at ¶¶ 1-5.) Joan and William Lamar O'Farrell are residents of the state of Florida. (Complaint at ¶ 6.) Each of the plaintiffs was contacted

---

    [1]Also set at that time was the defendants' motion to exclude the plaintiffs' expert testimony, on which the court also heard oral argument.



by the defendants regarding the purchase of a Harvestore silo, which were represented to be "oxygen-limiting" silos. Complaint at ¶¶ 12-14. The plaintiffs claim such representations were fraudulent, that the defendants engaged in a conspiracy to commit fraud and that the defendants engaged in a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1962(c). Essentially, the plaintiffs allege that the silos do not limit oxygen and therefore state that each of them is entitled to the return of the costs of the silos. The complaint and amended complaint allege that the Harvestores do not protect the feed from oxygen, that they damage feed during ordinary use, that the damaged feed compromised plaintiffs' herds, and the Harvestores caused decreased production. Complaint at ¶¶ 22, 34, 36. However, the plaintiffs allege in their response to the motion to summary judgment only that the silos do not limit oxygen and conceded at the hearing on the motion that they could prove none of the other claims. Transcript of motion hearing ("transcript") at 51-54, 62; Plaintiffs' Memorandum Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("plaintiffs' response") at 10-11.

This court finds that each of the plaintiffs had different experiences and must be considered individually concerning their claims of fraud and fraudulent representations.

**Plaintiff Henry**

Mr. Henry testified at deposition that he leased a Harvestore silo in 1979 and a second Harvestore silo in 1980. Depo. of Henry at 23. At the time, this plaintiff was running a dairy farm. Depo. of Henry at 33. However, he ceased his dairy operation in 1993 or 1994. Depo.

2

of Henry at 33. He stored Sudax in one of the silos and high moisture corn in the other one. Depo. of Henry at 44-45. Mr. Henry testified that he quit using both silos completely in 1983, although both of them are still sitting empty on his farm today. Depo. of Henry at 45-46. He further testified that "we were getting eighteen dollars a hundred for our milk, overnight it dropped to ten dollars, so I sold my cows and got out of the milk business. Depo. of Henry at 32.

Mr. Henry testified that the Harvestore dealer tested his feed twenty to twenty-five times a year and that, "He was great." Depo. of Henry at 61. Mr. Henry also stated that he did not have the health of his herd checked on a regular basis. Depo. of Mr. Henry at 90-91. He further stated that:

> A. ... I agreed with him, it was the Cadillac of the feed business.
> Q. You agreed with him?
> A. I agreed with him. Still do. I was really happy with it.

Depo. of Mr. Henry at 92-93. The plaintiff stated that he was told that the silo was "oxygen-free, the feed would come out just like it went in. It was just like a can of kraut, the kraut would not spoil until it got air." Depo. of Henry at 96. He also testified that he understood from this representation that he would have no spoilage and that feed spoils when it comes in contact with oxygen. Depo. of Henry at 122-123. Mr. Henry testified that he was never told that the Harvestore silo would increase milk production, but that he was told he would have better quality feed and assumed he would save on feed costs. Depo. of Henry at 106, 108.

3

Mr. Henry further testified that, to the best of his memory, he did not receive any

promotional publications in the mail from the defendants. Depo. of Henry at 116, 267-268.

As to the actual functioning of the silo, Mr. Henry testified as follows:

Q. Okay. When you began to feed the Sudax out of that Harvestore, given the sales representations or the statements that had been made to you about the performance of the Harvestore before you leased it, did the performance of the silo meet your expectations?
A. Yes, sir.
...
Q. ... Did you find that the feed coming out of the silo was coming out the way it went in as you had been told?
A. Yes, and they assured me it was.
Q. Did it appear that way to you?
A. Yeah.
Q. Do you have any information suggesting that was not true?
A. No, I don't.
...
A. ... My biggest interest was, compared to the way I had been feeding out of a bunker, there was almost no waste in my feed coming out of the Harvestore. It was just wonderful.

Depo. of Henry at 130-131.

A. I saved money on the labor. You put up fifteen or twenty thousand bales of hay, ten to fifteen, it takes fifteen to twenty men. Two men could fill this silo and I could feed it by myself, and that was the greatest thing since – I've experienced in the dairy business.

Depo. of Henry at 133.

A. Well, like I said, the savings I realized was my labor costs, the spoilage, no wasted feed, that's the main thing.

Depo. of Henry at 136.

4

Q. Compared to what you had been told by Mr. Fulton before you bought the silo and what you had seen in the advertising, was the feed as good as you had expected it to be?

A. Yes, it was.

Q. Okay. Was there any change in the quality of feed after that first year?

A. Not really. It was pretty much the same.

Q. Okay. So you continued to have the same experience where you had little or no waste at all in the feed?

A. Absolutely.

Q. And had no spoilage or mold?

A. Absolutely.

Q. And you continued to have the labor savings and cost savings associated with it?

A. Yes, sir.

Depo. of Henry at 139-140.[2]

This plaintiff did relate an incident where he noticed a small amount of spoilage in

1981, but reports that the dealer came and fixed "leaks" and he was satisfied. Depo. of

Henry at 140, 145. He stated after the repair, the feed returned to looking like it had been,

which was high-quality feed. Depo. of Henry at 141-143. This plaintiff testified that he

ceased using the first silo he purchased because the price of grain dropped drastically so he

no longer needed the Harvestore. Depo. of Henry at 164-167, 186.

Mr. Henry also testified that the second silo he purchased caught fire in 1983. Depo.

of Henry at 169. He did not know it was on fire until he opened the door to the auger. Depo.

of Henry at 171. He figured out that the fire resulted from air leaks in the Harvestore and

---

[2]See also depo. of Henry at 150 stating that the Harvestore was an excellent way to store feed; that the quality of feed in the second silo he leased was satisfactory and appeared to look the same coming out of the silo as when it went in (depo. at 159); that Mr. Fulton (a representative of the defendant) made no representations regarding cost or labor savings or airtightness on this silo (depo. at 160, 161); the feed from the first silo was high quality feed (depo. at 163); that the quality of feed was great (depo. at 208).

5

testified that he understood oxygen would have to be present in order to fuel the fire. Depo. of Henry at 172-174, 179. Mr. Henry also testified that before the time he found the fire, he had already decided to stop using the Harvestore silo because of the great reduction in grain prices. Depo. of Henry at 186, 189. Mr. Henry did no investigation into any of the problems he had and stated that both Harvestores are sitting on his farm essentially as he left them in 1983. Depo. of Henry at 195-196. He also opined that he knew the Harvestores had helped him, but could not state how much. Depo. of Henry at 208. He stated that no one ever suggested that the Harvestore silos caused him to lose milk production (depo. at 209) and that he was satisfied with the milk production (depo. at 207). In sum, Mr. Henry testified that:

> Q. ... Is it your belief or contention that the Harvestore silos or the feed from the Harvestore silos caused or contributed in any fashion to your filing for bankruptcy in 1985?
> A. No, sir. Harvestores, like I said, was the cheapest feed I've ever fed, according to labor and just no waste, they didn't contribute to it.

Depo. of Henry at 247.

> Q. As you sit here, having had experience with all kinds of different feed and storage facilities, is it your belief today, 1998, that the Harvestore feed that you fed from 1979 to 1983 was the best feed that you fed on your farm; is that true.
> A. That is absolutely true.
> Q. All right.
> A. Now, it's great.

Depo. of Henry at 249-250.

> A. I'll tell you, they was the Cadillac of the dairy business. I was well pleased with the performance that I got out of especially the 80, 80 foot one, it was – it's the only way to go.

6

Depo. of Henry at 270.

**Plaintiff McCaleb**

Mr. McCaleb purchased his Harvestore silo in 1980. He had continuous mechanical problems with the silo. Depo. of McCaleb at 74-75, 79-80. However, he testified at deposition that he had no problems with the quality of feed coming out of the silo. Depo. of McCaleb at 76, 90-91, 127-131. This plaintiff testified that he stopped using his silo in 1984 due to problems with the floor and unloader. Depo. at 13, 157-158.

Mr. McCaleb, while unhappy about the quality of the floor and unloader, alleges no damages connected to the silo's alleged failure to be oxygen-limiting. He testified that he did not know that the silo was not oxygen-limiting until 1994. Depo. of McCaleb at 139, 140, 161-162. However, he testified that when he started using the Harvestore, he had no problems with the quality of the feed. Depo. of McCaleb at 74. Further, he testified:

> Q. Did you have any mold or spoilage in the feed?
> A. Only what the salesman had told me. He said I could expect some spoilage and I would see a little bit.
> ....
> Q. And was it of any concern to you?
> A. No.

Depo. of McCaleb at 75.

> Q. Was there any amount of feed in the Harvestore that you would have to throw out that you simply couldn't feed to your animals?
> A. No.

Depo. of McCaleb at 76.

7

Q.  Did the appearance of the feed change at all from what you described the first year?

A. It didn't vary that much.

Q.  Okay.  It looked good to you?

A. Yes.

Q.  It smelled good to you?

A. Yes.

Q.  Did you continue to have it tested periodically?

A. Yes.

Q.  And the test results indicated to you that the feed was of good quality?

A. Yes.

Q.  And that continued to be true during the time you fed out of the Harvestore?

A. Yes.

Depo. of McCaleb at 91.

Q.  All right.  Tell me which parts of it you felt met your expectations and which didn't.

A. The feed looked pretty good.

Q.  Did it look as good as you would have expected it to look?

A. Probably.

Q.  All right.  Was there some aspect of the feed quality that did not meet your expectations?

A. It looked okay.

....

Q. .... Did it meet the expectations you had based on what the salesman had told you?

A. I suppose.

Depo. of McCaleb at 127-128.

Q.  Is it your claim that the Harvestore silo caused or contributed to the bankruptcy filing in any way?

A. No.

Depo. of McCaleb at 160-161.

**Plaintiff Cornelius**

Mr. Cornelius leased his silo in 1983 and bought it outright in 1991. Depo. of Cornelius at 15, 59. He testified that, at the time of his deposition, he was still using the feed out of the Harvestore for sheep. Depo. of Cornelius at 25. He testified that he never received anything from the defendants by mail. Depo. of Cornelius at 26. He also testified that he was never told that the Harvestore silo would improve the health of his animals and that the grain coming out of the silo looked fine. Depo. of Cornelius at 34, 37. Mr. Cornelius did testify that he has noticed more black kernels since 1997, but he did not consider this to be a problem for his animals and had been told by a veterinarian that the corn had caramelized. Depo. of Cornelius at 48-52. The vet did not tell him that he should not feed it to the sheep. Depo. of Cornelius at 52-53. Mr. Cornelius testified that no maintenance had been done on the silo since 1992 or 1993. Depo. of Cornelius at 62. Plaintiff Cornelius states, in deposition and under oath, that he has no damages from the silo and that everything that he was told about the silos was true from 1983 until 1994. Depo. of Cornelius at 69-70, 85.

Concerning the feed he stored in the silo, Mr. Cornelius testified:

Q. What was the condition of the milo and the barley as you saw it coming out?
A. It looked fine.
Q. Did it look as good as when you put it in?
A. There wasn't much difference.
....
A. The feed has been just fine until the last year or so.

Depo. of Cornelius at 36-37.

Q. Would it be fair to say that from '83 to '94 the average daily gain of the livestock fed from the Harvestore was as good or better than what you had been able to get before you acquired the Harvestore?
A. Yes sir.

Depo. of Cornelius at 40-41.

**Plaintiff Romine**

Mr. Romine leased his silo in 1984 and used it continuously until 1998 when he sold off all of his livestock. Depo. of Romine at 35-36. He testified that he had no problems with the silo until the spring of 1998, when he had very few hogs left and first noticed black kernels. Depo. of Romine at 69, 92. Up until that point, he stated that the feed looked good and no one who tested the feed ever said problems with it were found. Depo. of Romine at 64, 73. Mr. Romine stated in his deposition that his hogs did as good or better after he started using the Harvestore than before it.[3] Depo. of Romine at 112. Mr. Romine also stated that when the lease term of eight years ended, he purchased the silo for an additional $23,050.00. Depo. of Romine at 55-56, 97, 99. He further testified:

Q. Once you began feeding out of the silo that year, December 31st of 1984, did you have any problems with the quality of feed coming out?
A. After it was made into feed it looked great and smelled great to me.
....
A. It looked good to me.
Q. Did you have it tested at all?
A. The only thing we did was a moisture test to – moisture test to be able to formulate feed – or close.
Q. So you tested it as it was coming out or when it was going in?

_____

[3]Mr. Romine testified that his only complaint about the Harvestore silo was paying for it. Depo. of Romine at 116-117.

A. Both.

....

Q. When you were feeding out of the grain – feeding the grain out that first year, was there any mold or spoilage that you saw in the feed?

A. In the feed, none.

...

Q. Any evidence that the feed coming out – the grain coming out of the Harvestore that first year was anything other than good quality feed?

A. I thought it was good.

Depo. of Romine at 64-66. Regarding what he was told before he purchased the Harvestore

silo, Mr. Romine testified that, concerning the oxygen-limiting claim, he "understood you

put the grain in and you close it and there was an oxygen relief valve, there was breather bags

to equalize the pressure and that's – it would be taken care of." Depo. of Romine at 85-86.

He does not remember any claim by the defendants that his livestock would be healthier.

Depo. of Romine at 86, 88. Mr. Romine said that he was satisfied with the performance of

his silo until the Spring of 1998. Depo. of Romine at 94. Even after the Spring of 1998,

when Mr. Romine had few animals left and was using little feed, he testified:

A. Well, my understanding it was put it in and it's good and oxygen-limiting feed and it would be good until I used it.

Q. And you found that to be true until 1998?

A. Until it had been in there too long – or something happened.

....

Q. And you found that using the Harvestore silo that you were able to preserve high moisture grain and feed without spoilage or mold at least until 1998; correct?

A. As long as we was in and out everything looked good.

Depo. of Romine at 92-93.  Mr. Romine stated that the last time he had the silo inspected or

tested for leaks was in the late 1980's, when the breather bags were reharnessed.  Depo. of

Romine at 110-111.  As to the condition of his hogs, Mr. Romine testified:

> Q.  Did you have any impression one way or another as to whether or not your hogs
> were gaining –
> A.  I thought they did fine.
> Q.  Was it your impression that they did as well or better on the Harvestore feed as --
> A.  I thought they were doing as well – or better.

Depo. of Romine at 111-112.

> Finally, Mr. Romine gave the following testimony:

> A.  Right, But the reason I purchased the thing was to get the storage facility at the
> reduced price at harvest time.
> Q.  And in fact you got that?
> A.  Right.
> ....
> Q.  At least for an 11-year period of time all the representations made to you came
> true, didn't they?
> A.  I used it every day.
> ....
> Q.  As you sit here today with regard to everything that you can recall that he said
> about the performance of the Harvestore silo, all of those things came true when you
> used the Harvestore from at least 1983 to at least 1984 – or 1994?
> A.  Basically everything he said was true.

Depo. of Romine at 84-85.

**The Plaintiffs Barnett**

The Barnetts bought two silos in 1984.  Depo. of Alta Barnett at 22.  Mrs. Barnett

testified that she saw dark, cocoa  colored kernels in the late 1980's from the 20 x 80 silo, but

took no action to determine the cause of the coloration.  Depo. of Alta Barnett at 8-9, 10-12,

14, 17.  She further stated that she never saw any mold on the feed stored in either silo.

Depo. of Alta Barnett at 19.  She also stated that the corn coming out of the 20 x 50 silo had

a dark color, although the majority of it was yellow "like it should be."  Depo. of Alta

Barnett at 14-15.  Mr. Barnett testified that the feed always looked the same when it came

out of the silos as when it went into the silo.  Depo. of Robert Barnett at 43.  Mrs. Barnett's

biggest complaint with the silo's involved mechanical problems.[4]  Depo. of Alta Barnett at

18-19, 41-45.

Her deposition testimony seemed to be that her main source of unhappiness with the

Harvestores was that the picture was not as it was described, although she blames her losses

on the Harvestores.  Depo. of Alta Barnett at 21, 30.  Mrs. Barnett clearly stated that she did

not rely on any representations made to her by defendants' salesman.  Depo. of Alta Barnett

at 33.  Mrs. Barnett learned the 20 x 50 silo was not airtight in the late 1980's.  She stated that

she does not know that the 20 x 80 silo is not airtight.  Depo. of Alta Barnett at 35.  She also

testified that she and her husband have not used the silos since 1992.  Depo. of Alta Barnett

at 32.  See also depo. of Robert Barnett at 38.  Mrs. Barnett testified as follows:

> Q. Can you tell me what you recall about what Mr. Dowdy said about the Harvestore silos?
> A. Well, I understood that – and I should have known better, but I understood that the protein value – the value of the feed would be much better.

---

[4]As such, these complaints have nothing to do with this lawsuit. She also made quite clear during her deposition that she did not want to go into the feed lot business because she had all the money she wanted. She blames the Harvestores because they lost "everything" as a result of buying them. They owed no money before the purchase of the silos. Depo. of Alta. Barnett at 30.

13

Q. All right. Can you recall anything else?

A. Well, it would be air tight, it would be kept perfect condition; available whenever we needed it.

Q. Any other comments you can recall?

A. Well, he painted the picture as if we would make a lot of money, but I didn't believe it to begin with.

Q. All right.

A. Because I didn't want any money.

Depo. of Alta Barnett at 33.

Mr. Barnett testified as follows:

Q. What was the quality of the feed there at the beginning? What was the quality of the feed as you observed it coming out of the Harvestore silo, the 20 by 80?

A. It looked pretty well.

Q. What did it look like?

A. It looked like it had just been put in.

Q. From 1984 when you first began using the 20 by 80 until 1992 did you observe any differences or changes in the appearance of the feed coming out of the Harvestore other than what you have described to me?

A. No.

Q. So from 1984 to 1992 the feed coming out of the Harvestore, the 20 by 80, always looked about like what it was when you put it in?

A. Yeah

Depo. of Robert Barnett at 43.

Q. From 1984 to 1992 were you satisfied with the 20 by 50 foot Harvestore?

A. Yes. We never had any trouble with the 20 by 50.

Q. Were you satisfied with it, then, through that whole period of time?

A. Yeah.

Q. As you sit here today have you been satisfied with the 20 by 50 throughout the entire time that you have owned it?

A. As long as I had corn in it.

Q. Did you ever put anything in it besides corn?

A. We put wheat in it.

Q. The wheat grain?

A. Yes.

14

Q. When did you do that?

A. I don't know – whenever it run out of corn. That don't answer the question but that's the way it was.

Q. I understand. What did the wheat look like when it came out?

A. It wasn't in there long.

Q. All right. So the wheat wasn't spoiled or discolored in any way?

A. No.

Q. Then let me get back to my question: As you sit here today, have you always been satisfied with the 20 by 50 foot Harvestore?

A. To an extent. There was always something wrong somewhere.

Q. What? With the 20 by 50 now. We are just looking at the 20 by 50. Tell me what has been wrong with it and when.

A. Well, lightening got it one time.

....

A. Ain't nothing else.

Depo. of Robert Barnett at 56-58. He did note that the "tail end" of what came out of the 20 x 50 Harvestore was a different color. Depo. of Robert Barnett at 46. However, he then states he does not know that it was a different color. Depo. of Robert Barnett at 49. Mr. Barnett then testified that he is not aware of any problems the discolored corn caused his livestock. Depo. of Barnett at 53.

Mr. Barnett had complaints about the 20 x 80 Harvestore concerning mechanical problems. Depo. of Robert Barnett at 58-61. In response to a question concerning how he has been damaged by the Harvestores, Mr Barnett responded:

A. Well, I don't know whether I'm damaged or not, but I just didn't get the service delivery.

Q. The service in what way?

A. I didn't get the delivery.

Q. Oh, in terms of the feed out you are talking about?

A. Yeah.

Q. Is that your biggest complaint with the Harvestore?

A.  Right now it is.

Q.  And that is just related to the 20 by 80?

A.  Yes.

Depo. of Barnett at 75.

Q.  And what are you seeking in this lawsuit; do you know?

A.  I have no idea.

Q.  And what is your complaint about the Harvestore in this lawsuit?

A.  It just don't work.

Q.  Which one?

A.  The 20 by 80 for sure.

Q.  And it doesn't work in what way?

A.  It just -- it's always broke down.

Q.  The unloaders broke down?

A.  Or something.

....

Q.  You have had that problem with it being broken, that is to say, the 20 by 80, and you can't get feed out of it.  You had that problem since the 1980s, haven't you?

A.  Yeah.

Depo. of Robert Barnett at 84-85.  Mr. Barnett further testified that the property with the

Harvestores was sold to plaintiff Cornelius and that Mr. Cornelius now owns those silos.

Depo. of Robert Barnett at 24.

**The plaintiffs O'Farrell**

The O'Farrells have been residents of Florida during all times relevant to the

pendency of this litigation.  They purchased their first Harvestore silo in 1971, a second one

in 1972 or 1973 and leased another in 1974.  Depo. of William O'Farrell at 18, 23, 34, 39,

61.  These plaintiffs also used several concrete stave silos during this time as well.  Depo. of

O'Farrell at 40-41.  They ceased  using both silos in 1983 or 1984 when they sold off their

16

dairy herd. Depo. of O'Farrell at 50. These plaintiffs state that, in retrospect, the silos may

have caused their milk production to decrease, but that they have no evidence of this.[5] Depo.

of O'Farrell at 112-113. However, Mr. O'Farrell testified that he fed less pounds per cow

after 1971 based on what Mr. E. J. Cowen, the county agent from the University of Florida,

advised. Depo. of O'Farrell at 33-34. He also received advice from a Purina representative.

Depo. of O'Farrell at 34.

Concerning the quality of feed and the silos, Mr. O'Farrell testified as follows:

Q. .... can you tell me whether or not between 1971 and 1983, you had any problems with feed coming out of that 20- by- 60?

A. Not – maybe, I don't know, we had a chain to break or something one time.

...

Q. Okay. Other than that one time, did you ever have any problems with feed coming out of the 20-by-60?

A. The 20-by-60?

Q. The 20-by-60 Harvestore in which you stored high-moisture corn?

A. Oh, we never had any problem with the corn coming out of it.

Depo. of O'Farrell at 55-56.

Q. Now, let's move to the 20-by-70 in which you stored oatlage. Between 1972 or 1973 and when you stopped using that in 1983 or 1984, did you ever have any problems with the quality of the feed coming out of that unit?

A. I saw some mold that the dealer told me came from the top of the silage, the haylage, and he said that was normal.

...

Q. Okay. You would see it about the time that the top of the stack, feed stack would be coming down?

---

[5]When asked what changed his opinion, Mr. O'Farrell testified that a notice in a newsletter about the lawsuit caused him to think about it and that after receiving that notice, he believed that "maybe there was something wrong that I hadn't noticed." Depo. of O'Farrell at 114-115. This court notes that this plaintiff saw this notice approximately ten years after he sold his herd, quit using the silos and in fact no longer owns the silos or the farm. *See* depo. of O'Farrell at 117, 118, 168-169.

A. Yes, sir.

...

Q. Was it every year?

A. No, I don't think so.  It don't seem like that much.

Q. Okay, apart from the mold that you saw at the end of the feed-out, did you ever have any quality problems with the feed coming out of the Harvestore silo?

A. No, sir.

Depo. of O'Farrell at 57-58.  Mr. O'Farrell further testified that the Harvestore dealer represented to him that the milk production of his herd would go up and his feed costs would go down, but never told him that the Harvestore would improve the health of his animals. Depo. of O'Farrell at 78-80.  Mr. O'Farrell stated that once he began using the Harvestores, he felt like he was saving feed, the quality of the feed was what he expected it to be and that the performance of the Harvestore lived up to his expectations.  Depo. of O'Farrell at 80-81, 83-84.

Q. All right.  With regard to the quality of feed on the 25-by-80, can you tell me whether or not you had any problems with the quality of the feed in the 25 by 80 between 1974 and when you stopped using it in about 1983 or'84?

A. No, sir.

Depo. of O'Farrell at 62.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving

party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party asking for summary judgment always bears

the initial responsibility of informing the court of the basis for its motion and identifying

those portions of the pleadings or filings which it believes demonstrates the absence of a

genuine issues of material fact. *Id.* at 323. The burden then shifts to the nonmoving party

to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file' designate 'specific facts showing that there is a

genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this

burden the nonmoving party "must do more than simply show that there is a metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial."

Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477

U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material

19

issue of fact precluding summary judgment." *Clark v. Coates & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987). "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 351 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding Corp.*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 477 U.S. at 251-252.

Summary judgment is appropriate where the moving party shows an absence of evidence to

support an essential element of the nonmoving party's case. *Weiss v. School Board of*

*Hillsborough County*, 141 F.3d 990, 994 (11th Cir. 1998).

**FRAUD**

### Lack of Damages

This court rules as a matter of law that the evidence submitted in support of the

plaintiffs' claims for fraud does not support the allegations, thus these claims must fail.[6] The

plaintiffs have failed to raise any genuine issues of material fact for a jury to decide. The

plaintiffs can show no damages proximately caused by the silos. The plaintiffs' counsel

admitted during the hearing, "All the questions raised by Mr. Morris as to specificity about

the individual farms, we don't have that kind of specific testimony, because we don't have

that kind of specific records or claims for it. And that's -- inures to their benefit. We're not

going to be able to collect damages for that, because we don't have the records to prove it,

and we candidly acknowledge that." Transcript at 62. Even assuming that this court could

find that a fraudulent representation was made to the plaintiffs and that the plaintiffs relied

on this statement, the plaintiffs have shown no injury or damage proximately caused by such

reliance. The plaintiffs argue that their damages are represented by the purchase price of the

---

[6]During the hearing, the court specifically asked plaintiffs' counsel "[Y]ou're not claiming – or I don't think I took your complaint and the depositions as claiming damages for 20 years of bad feed, because taking these people's testimony, they fed for many, many years and not had any damages." The plaintiff's counsel responded "Right. That's the problem. What we're claiming is that we -- see, the thing is, our people were using conventional storage systems before they got talked into buying a Harvestore." Transcript at 55.

silos and that these damages were caused "as a proximate consequence of the willful and intentional misrepresentation that Harvestore silos were in fact oxygen limiting and would perform in a superior fashion to other conventional types of structures. Plaintiffs' Response at 11. The court notes that the plaintiffs' depositions are filled with references to the silo performing in either an acceptable fashion or in a superior fashion to other conventional silos. *See e.g.* depo of Henry at 249-250; depo. of McCaleb at 91; depo. of Cornelius at 69-70; depo. of Romine at 112; depo. of Alta Barnett at 14-15; depo. of Robert Barnett at 56-58; depo. of O'Farrell at 55-56, 80-81, 83-84.

Fraud, accompanied with damage to the party defrauded, gives a right of action. Section 6-5-100, Code of Alabama 1975. To establish their fraud claim, the plaintiffs must show a misrepresentation of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or made by mistake and innocently and acted on by the opposite party. Ala. Code § 6-5-101 (1975). The plaintiffs' allegations of fraud are based on the existence of a design defect. Each of the plaintiffs state that their damages were that they were duped into purchasing the silos because of the defendants' representations and therefore state that they are entitled to the total costs each plaintiff expended in acquiring his or her Harvestore(s) as well as the cost of maintenance and repairs. However the court notes that plaintiffs seem to allege that since the silos were not air tight,

22

they are entitled to claim as damages such things as repairs to the floor of the silo.[7]
Plaintiffs' Response at 10.

While the plaintiffs rely heavily on the case of *Martin v. A. O. Smith*, 931 F.Supp. 543
(W.D.Mich. 1996), in support their proposition that plaintiffs can be awarded the cost of the
silos as damages, this court finds that the *Martin* case had a different set of allegations of
damages from the facts before this court and that the court granted summary judgment to the
defendants on plaintiffs' fraud and conspiracy to commit fraud claims. *See* Plaintiff's
response at 12, *Martin*, 931 F.Supp. at 546-548. In considering the plaintiffs' fraud claims
in that case, the court found that the "economic loss doctrine" barred intentional tort claims
such as fraud. The court stated "all of the alleged misrepresentations concern the quality or
character of the Harvestore silos and could freely have been made part of the parties' contract
negotiations." *Id*., at 547. Beyond that, the *Martin* case is of little use to this court as it was
based on Michigan law.[8]

Likewise, the plaintiffs' reliance on *Valleyside Dairy Farms v. A. O. Smith*, 944 F.
Supp. 612 (W.D.Mich.1993), is misplaced. In that case, as in *Martin*, the court held that the

_____

[7]The plaintiffs have not brought now or at any time in the past any claims for breach of
contract or breach of warranty of merchantability or any similar claim based on the performance
of the silo.

[8]Even concerning the RICO allegations, this court finds the *Martin* case to be of little
instructional use as in that case the defendants "admit they knowingly misrepresented the
oxygen-limiting capabilities."*Martin*, 931 F. Supp at 549. The court therefore found a jury
question existed as to whether the defendants' admitted conduct proximately caused the injury of
which plaintiff complained. *Id*. In the case before this court, no such admission is contained in
the record. No such evidence has been admitted. This remains an allegation which the plaintiffs
must prove.

fraud claims of the plaintiff were barred by the economic loss doctrine. *Id.* at 617. The *Valleyside* court ruled that the fraud claims centered on the quality or character of the silos, about which the plaintiffs could have, but failed to, negotiate a warranty.[9] (The court allowed the RICO claims to be decided by a jury, having found that a genuine issue of material fact existed concerning when the plaintiffs should have discovered both the existence and source of their injury and that the injury was part of a pattern.) In *Thiss v. A.O. Smith Corp.*, 1:91:CV:239 (W.D.Mich,.1991), an unreported case relied on by the plaintiffs here, the plaintiffs could show actual damage to their dairy herd. That damage is lacking here.

The economic loss doctrine is most applicable to the O'Farrells, the only plaintiffs who reside in Florida.[10] The Eleventh Circuit Court of Appeals has stated that, under Florida's economic loss doctrine, a plaintiff may not raise tort claims to recover solely economic damages arising from a breach of contract absent evidence of personal injury or property damage. *Jones v. Childers*, 18 F.3d 899, 904 (11th Cir.1994). *See also Hoseline v. USA Diversified*, 40 F.3d 1198 (11th Cir. 1994) (stating that under Florida law, a party cannot recover in tort for economic losses incurred pursuant to a written contract); *Valleyside Dairy Farms*, 944 F.Supp. at 613 ("The economic loss doctrine bars tort recovery and limits

---

[9]*See also Agristor Leasing v. Spindler*, 65 F.Supp. 653, 654 (D.S.D.1987) ("the court characterized the injuries as economic loss and denied recovery in tort).

[10]This court must apply Florida substantive law to the state law claims of the O'Farrells, and Alabama law to the state law claims of all of the other plaintiffs.

remedies to those available under the Uniform Commercial Code where a claim for damages

arises out of the commercial sale of goods and losses incurred are purely economic).

During oral argument, the plaintiffs' stated that "the real question there is not whether

or not the plaintiffs believe they were getting good feed, the real question is whether or not

the plaintiffs were defrauded and bought and paid well over $600,000, all combined for silos

that cannot be oxygen limiting."   Transcript at 19.   The court finds this argument

tautological.  Surely the plaintiffs purchased the silos because they were led to believe that

they would provide "good feed".  Each of the plaintiffs testified at deposition that they got

"good feed".  Given this, even if the silos can be mathematically proven to not be oxygen

limiting, the plaintiffs still got what they wanted, "good feed".  From this argument of

plaintiffs, there can be no damages for fraud.  Furthermore, the plaintiffs have received,

some for more than a decade, use of the silos which performed adequately as far as

maintaining the feed.  For the plaintiffs to now receive the entire value of the silos back,

years after some of them completely quit using them, would create an extreme unjust

enrichment situation.  Plaintiffs do not make any argument that they are entitled to the value

of the silos less the amount of use they received from it or less the cost of some other storage

system.   As the Alabama Supreme Court quoted in affirming a directed verdict:

> How was [the plaintiff] damaged? In this case, certainly, from the years 1983,
> '84 and '85 there were less profits. As a matter of fact, those were losses ....
> And certainly, there is evidence here of money paid by [the plaintiff] when he
> purchased the business. However ... there has been no testimony by anybody
> that the value of the business was less than what [the plaintiff] paid for it ....

It is true that there were lost profits or losses in the operation, but those things are based on variables that we would have to speculate upon ....

*Patel v. Hanna*, 525 So.2d 1359, 1361 (Ala. 1988). In the case before this court, the plaintiffs have not put forth the first iota of evidence that the silo purchase caused lost profits.

Without damages, the plaintiffs cannot satisfy all of the elements for fraud. *See e.g., Mobile Bldg. & Loan Ass'n v. Odom,* 232 Ala. 19, 166 So. 698 (1936). Even if the plaintiffs could establish an injury they suffered from the purchase of the silos, this court can find, and indeed the plaintiffs cite, no case where the plaintiffs were ever entitled to recover the purchase price of a product, fifteen to twenty years after the purchase and retain the product as well.[11]

When a case is brought pursuant to Ala.Code 1975 § 6-5-100 through § 6-5-101, "the plaintiff must show not only that a material misrepresentation occurred but also that he has been damaged." *Wilhoite v. Franklin*, 570 So.2d 1236, 1237 (Ala.Civ.App.1990); citing *Shafer v. Timmons*, 51 Ala.App. 157, 283 So.2d 609 (1973). Alabama law makes clear that in a suit for fraud alleging a misrepresentation about a product, the correct measure of damages is the difference between what the property is actually worth and what it would have been worth if the property had been as represented. *Morris v. Westbay Auto Imports, Inc.,* 512 So.2d 1373, (Ala.1987); *Sanford v. House of Discount Tires,* 692 So.2d 840, 842

---

[11]The plaintiffs have made no offer to return the silos to the defendants. Indeed, some of the plaintiffs have since sold their silos, along with their farms to other individuals. For example, Mr. Cornelius now owns the Harvestores for which the Barnetts sue.

26

(Ala.Civ.App.1997); *Wilhoite,* 570 So.2d at 1237 (the "purpose of damages in a case such as this is to place the defrauded person in the position he would occupy if the representations had been true"). The defendants argue that the plaintiffs have not shown any harm from any fraud or racketeering activity which may exist. If the plaintiffs can show no injury, then their fraud claims must fail. *Mobile Building & Loan Association v. Odom,* 166 So. 698, 700 (Ala. 1936).

In the recent case of *Ford Motor Company v. Rice,* the Alabama Supreme Court stated that "...[F]raud, without damage, or damage, without fraud, gives no cause of action..."[12] *Ford,* 726 So.2d 626, 627 (Ala.1998), citing *Einstein, Hirsch & Co., v. Marshall & Conley,* 58 Ala. 153, 160 (1877); *Wall v. Graham,* 192 Ala. 396, 399, 68 So. 298, 299 (1915).

Suppression of a material fact requires 1) a duty to disclose the facts; 2)concealment or nondisclosure of material facts by the defendant, 3)inducement of the plaintiff to act and

---

[12]In *Ford Motor Co. v. Rice,* the court summarized the plaintiffs arguments as:

> Instead, the plaintiffs maintained that they had been damaged by being induced to purchase vehicles that they say were worth less than they would have been worth had they been what Ford had represented them to be.   That is, the plaintiffs contended that they did not get what they bargained for, in that their vehicles, they said, contained a safety defect that Ford fraudulently failed to disclose, thereby suggesting that the vehicles did not contain such a flaw.

726 So.2d 626, 627 (Ala. 1998).  This court has considered plaintiffs' arguments that the *Ford* case is irrelevant because it was brought as a product liability claim. This court finds the *Ford* case to be very persuasive on the plaintiffs' fraud claims as this court finds that the same are really in the nature of a "product defect" type claim, in that the plaintiffs here allege their damages are the purchase value of the product and that, in *Ford,* the plaintiffs strenuously argued that the defendants fraudulently suppressed material facts.  This court actually finds the *Ford* case to be quite similar to the facts before it. *See e.g. Valleyside,* 944 F.Supp. at 617 ("plaintiffs' allegations are essentially indistinguishable from a contract claim that they could have brought against their seller, had they negotiated a warranty of quality and performance").  Regardless of how plaintiffs word their claims, whether as fraud or breach of warranty or other contract claim, plaintiffs really argue that the product they each purchased possibly may not have performed as they were promised it would.

4) action by the plaintiff to his injury. *Ford Motor Co.*, 726 So.2d at 627; citing *Foremost Ins. Co., v. Parham,* 693 So.2d 409, 423 (Ala.1997).

This court also finds *Pfizer, Inc. v. Farsian*, 682 So.2d 405 (Ala.1996) to be instructive. In that case, the Eleventh Circuit Court of Appeals certified to the Alabama Supreme Court the question: Does a heart valve implantee have a valid cause of action for fraud under Alabama law if he asserts that the valve's manufacturer fraudulently induced him to have the valve implanted when the damages that he asserts do not include an injury-producing malfunction of the product ... ? *Pfizer,* 682 So.2d at 406. The Alabama Supreme Court responded by stating "Regardless of how Farsian pleads his claim, his claim is in substance a product liability ... claim .... Alabama courts have never allowed a recovery based on a product that ... is and has been working properly. Each of our prior cases in which fraud or other intentional conduct was alleged has involved a failure, a malfunction, or an accident that involved the defendant's products and which injured the plaintiff." *Pfizer,* 628 So.2d at 407. Regardless of how the plaintiffs here phrase their claim, they have no evidence that their silos did not work properly.[13]  As such, they are barred from recovery.

This court has considered the claims of the plaintiffs as well as their deposition testimony. None of the plaintiffs is able to state how he or she was injured by use of the Harvestore silo, none of them is able to show harm to his or her livestock due to use of the

---

[13]Obviously, the plaintiffs who alleged mechanical problems with their silos do not have a product that is working properly, but none of these plaintiffs have claimed the mechanical failures as underlying their causes of action. Rather, each plaintiff's claim is identical, alleging fraud by the defendants in that the silo is not oxygen-limiting or oxygen-free.

silo. While plaintiffs allege that they were fraudulently induced to purchase the silo because

it was represented to be something that it was not, none of the plaintiffs can show any injury

from the use of the silo.[14]  Thus, even assuming that the silos are not and cannot be airtight,

if the use of the silo caused no injury, then the plaintiffs can have no damages.[15]

This court finds that the simple purchase of the silo is not enough to show damages

under Alabama law.  This court makes this decision based on the cases of *Ford* and *Pfizer*,

where, as here, the plaintiffs' complaints were that they purchased a product that was not as

they expected it to be, regardless of the legal language in which the claims were couched.

*See Ford Motor Co.* 726 So.2d at 628, *Pfizer*, 628 at 407.  Plaintiffs here can show no injury

resulting from the use of this product.  "It is well established that '[p]urchasers of an

allegedly defective product have no legally recognizable claim where the alleged defect has

not manifested itself in the product they own.'" *Ford Motor Co.*, 726 So.2d at 628, citing

*Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y.1997)(other citations omitted).[16]  In

---

[14]See e.g. transcript at 53 (plaintiffs' argument that the plaintiffs cannot prove damages to their herds) and transcript at 56 (plaintiffs argument that the quality of the feed is not the issue, but that the plaintiffs can prove the silo is not air tight). Compare to plaintiffs' argument, transcript at 62, "that doesn't mean we can't collect for the money that we paid on the silo, which is a generic product that produces a generic end result, which is the feed coming out at the bottom. And our experts are going to testify as to what the feed quality was on the individual farms..."

[15]The plaintiffs have submitted no evidence that, but for defendants representations the plaintiffs would have purchased cheaper silos or no silos. Rather, plaintiffs have chosen to focus on whether or not the Harvestore silo really is airtight. Furthermore, even if plaintiffs had made such an allegation, they would then have to prove a difference in the quality or cost of the feed between the conventional silo and the Harvestore.

[16]This court has conducted an exhaustive survey of other litigation brought against these defendants. This court has found the cases where the plaintiffs recovered based on this theory to be scarce. More common, the claims have been dismissed. *See e.g., Seibel v. A.O. Smith Corp.*, 1998 WL 315067 at 2-3 (W.D.Wis.1998)("Defendants' alleged misrepresentations concerning the ability of Harvestore silos to preserve the feed by limiting its exposure to oxygen relate to the quality or characteristics of the silos (citations omitted) .... Accordingly, they are not actionable

29

*Ford,* the Court observed that "[i]ndeed, the plaintiffs' allegations give no indication that the vehicles in question, which have been on the road from 8 to 15 years, have provided their owners with anything but satisfactory performance." *Ford Motor Co.*, 726 So.2d at 628.

Similarly, this court, having read each of the plaintiffs depositions, finds that the plaintiffs have gotten years of use from their silos without complaint concerning the oxygen entering the silo from whatever source.[17] Claims based upon "allegations of inherent product 'defects' that have not caused any tangible injury are not viable..." *Ford Motor Co.*, 726 So.2d at 629. Clearly, the plaintiffs' claims for fraud must be dismissed.

This case, whether alleged as a fraud claim or as a breach of contract claim, involves the same question that the court considered in *Ford Motor Company*: Does an alleged defect that has not manifested itself in such a way as to cause any observable adverse physical or economic consequences constitute an "injury" that will support a claim for fraudulent suppression. We simply hold that it does not. *Id.*, 726 So.2d at 631.

This court, having considered all of the evidence submitted by the parties, finds that the plaintiffs can show no damages from the purchase of the silos. Furthermore, this court

---

in tort ... "); *Martin v. A.O. Smith Corp.*, 931 F.Supp. 543, 546-548, (W.D.Mich.1996) ("Plaintiffs undisputedly seek recovery of economic loss caused by defective silos ..... Here, all of the alleged misrepresentations concern the quality or character of the Harvestore silos and could freely have been made part of the parties' contract negotiations. The present allegations do not make out claims for fraud in the inducement...., the court finds that there is no genuine issue as to any material fact and that the economic loss doctrine bars plaintiffs' fraud claims"). *See also Valleyside Dairy Farms v. A.O. Smith Corp.*, 944 F.Supp. 612 (W.D.Mich.1995).

[17]The court has considered the two plaintiffs who had unloader/floor problems with their silos, however, these complaints have absolutely nothing to do with the allegations of fraud which form the basis of this suit and are even more clearly contract and not fraud claims than the allegations here. No doubt exists that any contract claims were barred by the statute of limitations long ago.

finds that even if the plaintiffs could show damages, the cost of the silo (the only measure of damages in evidence), is not and has never been the measure of damages in Alabama. Indeed, this court finds that the Alabama courts have stated that:

> Generally, when a purchaser alleges misrepresentation and does not offer to return the item purchased and rescind the sale, his measure of damages is the difference between the value of the item as represented and its actual value.

*Johnny Spradlin Auto Parts v. Cochran*, 568 So.2d 738, 744 (Ala. 1990); *Cahaba Valley Dev. Co., v. Nuding*, 512 So.2d 46 (Ala.1987) (other citations omitted). *See also Hammonds v. Turnipseed*, 709 So.2d 39, 43 (Ala.Civ.App.1997) ("it is well settled that [t]he purpose of damages [in a fraud case] is to place the defrauded person in the position he would occupy if the representations had been true" (citations omitted)). No allegations that any such discrepancy exists were made by the plaintiffs.

**Statute of Limitations**

The defendants argue that even if the plaintiffs could put forth evidence of injury to the feed or livestock, their fraud claims would still be time barred under Alabama law. Alabama law provides a two year statute of limitations for fraud. Ala.Code 1975 § 6-2-38(1). Alabama Code § 6-2-3 states that actions for fraud accrue upon the discovery of the facts constituting fraud. Plaintiffs argue that discovery would have occurred at the time each plaintiff received notification of the *Ilhardt* class action.[18] Plaintiffs' response at 23,

---

[18]In that case, *Ilhardt v. A. O. Smith Corp., et al.*, Civil no.: C-1-92-635 (S.D.Ohio), the court decertified the class action. *See Ilhardt*, 168 F.R.D. 613 (S.D.Ohio 1996).

transcript at 20. The defendants argue that such discovery would have been the time that each plaintiff had reason to believe oxygen was entering his or her silo(s). The defendants state at that point, Alabama law imposed a duty to investigate, which no plaintiff undertook. Transcript at 10.

Even if this court found that plaintiffs had established proof of damages, this court finds that some of the plaintiffs' claims are further barred by the applicable two year statute of limitations. Mr. Henry, in deposition, testified that he knew, in 1983, that the silo had to be allowing in oxygen in order for a fire to start and continue to burn inside of it. As such, the plaintiff was on notice at that time that the facts forming the basis for his fraud action existed. Depo. of Henry at 169-173. Mr. Cornelius testified that he was told, by a Harvestore salesman in the early to mid-1980's that oxygen was entering through the unloader door. Depo. of Cornelius at 41. Mr. McCaleb testified that he saw a little mold or spoilage, which the salesman told him he could expect in the fall of 1980. Depo. of McCaleb at 75. Mr. McCaleb testified that mold would grow in a bunker silo anywhere it could get air. Depo. of McCaleb at 29. This plaintiff's knowledge that oxygen causes mold, combined with his seeing mold in the Harvestore feed was enough to impose upon him a duty to investigate whether or not his silo was oxygen-limiting as a matter of law. Mrs. Barnett testified that she learned that one of their silos was not airtight in the latter part of the 1980's. Depo. of Alta Barnett at 35. Mr. O'Farrell testified that he saw mold coming out with the

32

feed in his silo at some time between 1971 and 1983 when he stopped using the silo.[19] Regardless of whether the Harvestore representative told Mr. O'Farrell this was normal, the plaintiff had sufficient notice to at least investigate whether oxygen was reaching his feed in the silo. *See Phillips v. Amoco Co.*, 799 F.2d 1464, 1469 (11th Cir. 1986); *Hunt v. American Bank & Trust Co.*, 783 F.2d 1011, 1014 (11th Cir.1986). Clearly, none of these plaintiffs' claims survive the motion for summary judgment based upon the statute of limitations filed by the defendants.

Each of the plaintiffs, with the possible exception of Mr. Romine, had some occurrence which should have placed him or her on notice that the silo was not oxygen limiting long before the filing of this action. The plaintiffs argue that they could not be placed on notice "that it was a mathematical impossibility for the Harvestore structure to operate as an oxygen limiting structure as sold until he received the class action notice in the summer of 1994." Plaintiffs' response at 15. However, the fact that mathematically the structure could not limit oxygen was not the cause of any of the alleged injuries.[20] Why the structure did not work as advertised is not, and has never been, a requirement to file a fraud

---

[19]This leaves only plaintiff Romine's fraud claim surviving the statute of limitations defense in the defendants' motion for summary judgment.

[20]Plaintiffs also argue that "Mr. Henry's knowledge regarding oxygen entering the silo was in no way of the nature of the fraudulent representations actively perpetrated by this Defendant regarding the fact that a Harvestore silo cannot, by the laws of physics, be an airtight structure due to the bottom unloader and the top two way breather valve." Plaintiffs' response at 16. The plaintiffs allege they were damaged because the structure was not airtight. Whether due to the laws of physics or because they were simply poorly constructed, once the plaintiffs knew air was entering the silo, they were on notice of the defendants alleged fraud and the cause of action accrued then.

action. Rather, the factual knowledge that the structure does not work as advertised (i.e. did not seal up like a can of kraut) is enough, at least in Alabama, to place the plaintiffs on notice that they were the victims of fraud.

The court finds the plaintiffs' argument nonsensical. The plaintiff argues that the defendants own documents show that oxygen enters the silo during the unloading of feed. Transcript at 19. The plaintiffs then argue that they had no notice until they received the class action notifications that they had been "defrauded of this type of fraud, the fact that they bought an oxygen-limiting silo which could not be oxygen-limiting." Transcript at 20. The plaintiffs then state "Same thing with Tom Cornelius. He inquired directly of a Harvestore representatives, why am I getting dark kernels? Tom Cornelius asked specifically and the representative told him, well, those dark kernels get down the slide sheet after you open the unloader door..."[21] Transcript at 21. As the court understands the plaintiffs' argument, the plaintiffs thought they purchased oxygen-limiting silos, noticed dark kernels, and, upon inquiry, were told that oxygen enters the silo when the unloader door is opened, which is exactly what the plaintiffs argue the defendants' documents state. This court finds

---

[21]The actual testimony of Mr. Cornelius was:
Q. At that time did you have any reason to believe that those few dark kernels were caused by air or oxygen, getting to the feed?
A. He said it was.
Q. He said it was?
A. Yeah. He said it was when I opened the door to unload it that it was getting in the sheet. He said that's the reason I would get a few when it first came out.
Q. All right. So at least as of that time you understood that air and oxygen was at least getting to some of the feed and that was the explanation for why it was – you had a few kernels that were dark?
A. When I opened the door.
Depo. of Cornelius at 73-74.

34

that, upon inquiry, the plaintiffs who asked were told oxygen gets in when the unloader door is opened.

Furthermore, in *Thiss*, which the plaintiffs cite to assist their RICO claims, the court ruled that "I believe that the plaintiffs are also mistaken when they assert that the relevant moment is when they identified the connection between the herd's health problems and the failure of the silos to limit oxygen intake. The relevant causal connection is between the 'problems on the dairy farm [and] the Harvestore silos' ... the plaintiffs need not know exactly why or how the silos harmed the feed." *Thiss v. A. O. Smith Corp.*, 1:91:CV:239 (W.D.Mich,.1991). The plaintiffs here stated during the oral argument that "the extent to which the individual farmer was damaged in his livestock production is a specific question to each farm ... we aren't going to be able to prove damages to the herd." Transcript at 52-53. Yet in *Thiss*, the court found that the causal connection of relevance was that between the defendants alleged misrepresentations and subsequent problems with the livestock and feed. *Thiss v. A. O. Smith Corp.*, 1:91:CV:239 (W.D.Mich,.1991).

The plaintiffs argue that this time of discovery is 1994, when the plaintiffs received notification of the *Ilhardt* class action. The plaintiffs state that they could not have been on notice of the fraudulent misrepresentation regarding the oxygen-limiting abilities of the silos before receipt of the *Ilhardt* class notification. *See* transcript at 21. The plaintiffs state that none of them had "actual knowledge of the true nature of the alleged fraud" until receiving the class action notifications. Plaintiffs' response at 24. Even accepting this statement as

35

true, this court finds that "actual knowledge of the true nature of the alleged fraud" is not the standard which this court must apply to the facts before it. Rather, the law in Alabama states that "the facts constituting the fraud are to be considered as discovered when they ought to be discovered, when such facts come to knowledge as provoke inquiry in a person of ordinary prudence, and which, if followed up, would lead to the discovery of the fraud." *Boros v. Palmer*, 472 So.2d 1020, 1023 (Ala.1985).

The plaintiffs received many years use from the silos and were satisfied with the manner in which the silos stored their feed. This court thus being unable to find any injury or damages, the defendants' motion for summary judgment on counts I and II of the complaint be and hereby is **GRANTED**.

Because this court can find no actionable fraud on the part of the defendants, this court cannot entertain the plaintiffs' claims for conspiracy to commit fraud. *Allied Supply Co., Inc., v. Brown*, 585 So.2d 33, 36 (Ala.1991). The court having so found,

It is therefore **ORDERED** by the court that the defendants motion for summary judgment on count III of the complaint, conspiracy to commit fraud, be and hereby is **GRANTED**.

### The RICO claims

In order to ultimately prevail on their RICO claims, the plaintiffs must establish:
1) a violation of 18 U.S.C. § 1962 (that is, a pattern of racketeering activity);  2) an injury to business or property; and 3) that the violation caused the injury. *Avirgan v. Hull*, 932 F.2d

1572, 1577 (11ᵗʰ Cir.1991); *Beck v. Prupis*, 162 F.3d 1090, 1095 (11ᵗʰ Cir. 1998); *Bivens Gardens v. Barnett Bank*, 140 F.3d 898, 906 (11ᵗʰ Cir. 1998) (the injury must be the direct result of alleged racketeering activity). *See also Beck*, 162 F.3d at 1095, fn. 8 (stating that Section 1962(c) prohibits participation in the conduct of an enterprise involving interstate commerce through a pattern of racketeering activity).

The defendant argues that the necessary element of injury or damage for plaintiffs to establish their RICO claims is lacking; that the claims are barred by the statute of limitations and that the RICO distinctiveness requirement is not met. As to the requirement of injury, the defendants assert that the plaintiffs have no damage and no damage caused by the defendants' alleged fraud.

A civil RICO plaintiff must show that the racketeering activity caused him to suffer an injury. *See Beck*, 162 F.3d at 1095, 18 U.S.C. § 1964(c). Additionally, the racketeering activity "must be more than simply the 'but for' cause of the injury; it must also be the proximate cause. *Beck*, 162 F.3d at 1096. The plaintiffs here allege that their sole injury was the purchase of the silos, and as such, they are entitled to the return of the cost of the silos. For purposes of considering the defendants' motion for summary judgment in the light most favorable to the plaintiffs, this court shall assume that the plaintiffs allegations that the silos were not oxygen limiting is true. Thus, the plaintiffs argue, they would not have purchased the silos had the representations not been made. Yet, not one of the plaintiffs can establish any injury to the feed or the livestock from the silo. Each of the plaintiffs states that the

37

advantage of an oxygen limiting silo is less feed spoils. Each of the plaintiffs admits, to

varying degrees, that he or she was pleased with the quality of feed coming out of the silo

and testified at deposition that he or she had very little waste. As such, this court can find

no injury or damages to the plaintiffs from the Harvestore silos. Several of the plaintiffs

testified, under oath and detailed above, that the representations made by the dealers were

true.[22]

The statute of limitations for a civil RICO action is four years from the time the

plaintiff discovers or reasonably should have discovered both the existence of and the source

of his injury and that the injury is part of a pattern of racketeering. *Bivens Garden Office*

*Building v. Barnett Bank of Florida, Inc.,* 906 F.2d 1546, 1554-1555 (11th Cir.1990); *see also*

*Klehr v. A.O. Smith*, 87 F.3d 231, 239 (8th Cir.1996); *aff'd* 117 S.Ct. 1984 (1997). The

plaintiffs here argue that this time of discovery is 1994, when the plaintiffs received

notification of the *Ilhardt* class action. The plaintiffs state that the plaintiffs could not have

known their injuries were the result of a pattern of racketeering activity before receipt of the

*Ilhardt* class notification. Plaintiffs' response at 23.

The Eleventh Circuit has ruled that a RICO cause of action accrues as soon as the

plaintiff discovers or reasonably should have discovered both the existence and the source

of the injury and that the injury is part of a pattern. *See Bivens Garden*, 906 F.2d at 1554-

---

[22]The court explicitly exempts Mrs. Barnett from this statement as her testimony was that she did not rely on anything the Harvestore dealer said.

1555. The facts of this case seem to require that the plaintiffs should have discovered that their alleged "injuries" were part of a pattern within four years of being put on notice that the silos were not as represented to be by the defendants. Each of the plaintiffs knew from whom he or she bought the silo(s) and had to know that the defendants were more than likely making similar representations to others, especially considering that three of the plaintiffs knew each other long before this suit was filed (Cornelius, Barnett and Romine). Thus, plaintiffs should have reasonably discovered that their alleged injuries were part of a pattern before June 4, 1994, four years preceding the filing of this litigation.[23]

The court finds the proposition expounded by the plaintiffs that they could not know the source of their injury until they received the class notice to be absolutely ludicrous. The plaintiffs here allege that the actual purchase of the Harvestore silos caused their injuries. As such, the plaintiffs must be alleging that the source of their injury was the Harvestore seller, whether it be the dealer or the parent corporation. Therefore, the plaintiffs had to know the source of their injury to be the defendants at the time of the purchase of the silos.[24] Furthermore, the plaintiffs could have easily determined that the alleged misrepresentations were part of a pattern. For example, the plaintiffs testified that they were each shown the same video, the same brochures, received the same magazine and heard the same sales pitch.

---

[23]Without ruling on the issue, the court finds that even if the statute of limitations for RICO was tolled by the plaintiffs joining the *Ilhardt* action, the plaintiffs would still have to show that they could not reasonably discover the source of their injury until 1990.

[24]In other words, once the plaintiffs were put on notice that they had some alleged injury from the alleged fraud of the defendants, the plaintiffs had to already know who had perpetrated that fraud.

No great leap is needed to place the plaintiffs on notice that the defendant had consistently made identical representations to others. Thus, the final element for the statute to begin running was the identification of an injury. For Mr. Henry, this date would be 1983, thus he had until 1987 to file his RICO claim, assuming he could show damages from the silos.[25] Depo. of Henry at 169-173. Similarly, Mr. Cornelius testified that he was told in the early to mid-1980's that oxygen was entering through the unloader door. Depo. of Cornelius at 41. Mr. McCaleb testified that he saw a little mold or spoilage in the fall of 1980. Depo. of McCaleb at 75. Mrs. Barnett testified that she learned that one of their silos was not airtight in the latter part of the 1980's. Depo. of Alta Barnett at 35. Mr. O'Farrell testified that he saw mold coming out with the feed in his silo at some time between 1971 and 1983 when he stopped using the silo.

Even assuming the plaintiffs' claims were timely, the plaintiffs still must allege an injury they have suffered as a result of the defendants actions. As this court detailed above, the plaintiffs here have suffered no identifiable injury from anything the defendants did or did not do concerning the oxygen-limiting nature of the silos.

Prosecution of a civil RICO action under 18 U.S.C. § 1964(c) requires an injury directly or proximately caused by the alleged predicate racketeering activity. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

---

[25]Mr. Henry testified that he quit using the silos in 1983 for reasons wholly unrelated to the silos themselves. His deposition testimony, *supra*, makes clear he had no problems with his silo. As such, Mr. Henry has no injury and therefore no RICO claim.

A factor is a proximate cause if it is a "substantial factor in the sequence of responsible causation." *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir.1994), *modified*, 30 F.3d 1347 (11th Cir. 1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). Necessary for such a claim is an injury, which this court has been unable to find in plaintiffs' pleadings, depositions, allegations, legal memoranda or oral argument. Unlike the facts before the court in *Martin*, the plaintiffs here have explicitly stated that they sue only for the cost of the silos, and cannot prove feed spoilage, nutritional deficits, depressed milk production, breeding problems, less healthy herds or related economic damages due to the silos alleged failure to limit oxygen. 931 F.Supp. at 545-546. Without even an allegation of any damages flowing from the alleged racketeering activity, no genuine issue of material fact exists for this court to submit to a jury. *See Bivens*, 906 F.2d at 1550, n.7; citing to *Sedima, S.P.R.L v. Imrex Co., Inc.*, 473 U.S. 479, 496-97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (A defendant who violates RICO is not liable to those who have not been injured). *See also Haroco, Inc., v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 398 (7th Cir. 1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437.

This court being unable to identify any injury to the plaintiffs from the purchase of the Harvestore silos, this court finds that the plaintiffs fail to allege an essential element of their RICO claim. As such, this court **ORDERS** that the defendants' motion for summary judgment on Count IV of the complaint be and hereby is **GRANTED.**

No cause of action remaining against the defendants, it is further **ORDERED** by the court that judgment be and hereby is entered in favor of the defendants and against the plaintiffs. The case is **DISMISSED** with prejudice.

     **DONE** and **ORDERED** this the _____ 9 _____ day of <u>July,</u> 1999.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE